## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIM. ACTION 22-0222-WS |
| | ) |
| TRE'VON DEVONTE LEWIS, | )                 <u>PUBLISH</u> |
| | ) |
| Defendant. | ) |

## ORDER

This matter is before the Court on the defendant's motion to dismiss the indictment.  (Doc. 18).  The government has filed a response and the defendant a reply, (Docs. 21, 22), and the motion is ripe for resolution.  After careful consideration, the Court concludes the motion is due to be denied.

## BACKGROUND

The indictment contains two counts.  Count One charges that the defendant, with knowledge that he was an unlawful user of marijuana, knowingly possessed a firearm, in violation of Section 922(g)(3).  Count Two charges that the defendant knowingly possessed a firearm, knowing and having reasonable to cause to believe the firearm was stolen, in violation of Section 922(j).  (Doc. 1).

## DISCUSSION

The defendant argues that both statutes are unconstitutionally vague, facially and as applied.  The defendant also argues that both statutes violate the Second Amendment, facially and as applied.

## I. Vagueness.

"Our cases establish that the Government violates this [due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 596 (2015).  The defendant argues that Section 922(g)(3) is unconstitutionally vague because it does not define "unlawful user," leaving ordinary citizens to guess whether, at any given point in time, they may or may not lawfully possess a firearm.[1]  The defendant argues that Section 922(j) is unconstitutionally vague because it does not define "reasonable cause to believe" that a firearm was stolen, leaving ordinary citizens no safe course of action short of overseeing the entire chain of custody of a firearm from manufacture forward.[2]

As noted, the defendant brings both facial and as-applied challenges.  The government argues that both types of challenge are premature and will remain so until trial.  (Doc. 21 at 5-7).  The government notes that the defendant's as-applied challenge to Section 922(g)(3) depends on his history of illegal drug use, the evidence regarding which has been neither presented to the Court nor agreed to by the parties.[3]  His as-applied challenge to Section 922(j) depends on the

---

[1] Section 922(g)(3) applies both to "unlawful users" and to the "addicted."  The defendant makes a similar vagueness argument regarding addiction but, because the indictment charges him only with being an unlawful user, the Court does not consider any vagueness challenge regarding "addicted."

[2] The indictment charges that the defendant possessed the firearm "knowing and having reasonable cause to believe" it was stolen.  (Doc. 1 at 2).  The government does not suggest that its pleading of the defendant's actual knowledge moots his vagueness challenge.

[3] According to the defendant, he has never been convicted of a controlled substance offense and has no criminal history indicating his regular use of a controlled substance.  According to the defendant, the government has no evidence that he had consumed any of the marijuana found on his person at the time of his arrest.  The defendant acknowledges that the government claims he admitted being a "heavy user" of marijuana.  (Doc. 18 at 12-13).

information in his possession bearing on the firearm's history, as to which the record is silent.  Because federal law provides no mechanism for resolving such factual issues short of trial, the government concludes that the defendant's as-applied challenges are premature.  The defendant concedes that his as-applied challenges cannot be resolved on the present record.  (Doc. 22 at 1-2).

The government argues that the defendant's facial challenges are also premature, based on "the rule prohibiting a facial vagueness challenge by one to whom a [criminal] statute may be constitutionally applied." *United States v. Di Pietro*, 615 F.3d 1369, 1372 (11th Cir. 2010) (internal quotes omitted).  (Doc. 21 at 6-7).  The defendant responds that this rule is not implicated when, as here, the defendant's as-applied challenge has not been resolved and cannot presently (for lack of factual development) be resolved, and he adds that failing to consider his facial challenge now would improperly subject him (if the statute is indeed impermissibly vague on its face) to an unconstitutional prosecution.  The defendant argues further that the Supreme Court has recently expanded the availability of facial challenges not preceded by resolved as-applied challenges. (Doc. 22 at 1-2).

Because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," a court presented "a facial challenge to the … vagueness of a law … should … examine the complainant's conduct *before* analyzing other hypothetical applications of the law." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 493-95 (1982) (emphasis added).[4]  The defendant identifies no authority limiting the sequence established in *Hoffman* to cases where the as-applied and facial challenges ripen at the same time.  On the contrary, resolution of a facial challenge must await resolution of an unripe as-applied challenge.  Thus, for example, counsel was not ineffective in failing to move for pretrial

---

[4] This requirement is "relaxed" in the First Amendment context.  *United States v. Williams*, 553 U.S. 285, 304 (2008).

dismissal due to facial vagueness, since any such motion "must first be considered in light of the facts of the case – i.e., on an as-applied basis." *Love v. Butler*, 952 F.2d 10, 13-14 (1st Cir. 1991).[5]

The defendant does not assert a constitutional right to pretrial resolution of his as-applied challenge and, to the extent that resolution of his facial challenge requires prior resolution of his as-applied challenge under *Hoffman*, it would seem to follow that he can claim no constitutional right to pretrial resolution of his facial challenge.  The question is moot, because the defendant offers no authority or argument in support of his *ipse dixit* that his due process rights would be infringed by delayed consideration of his facial challenge, and the Court declines to develop or support an argument on his behalf.

The defendant next argues that, whatever the legal landscape was previously, the Supreme Court rearranged it in *Johnson*.  (Doc. 22 at 1-2). Although the majority opinion employed neither term, the dissent recognized that *Johnson* accomplished a "facial invalidation" of ACCA's residual clause on vagueness grounds and did so without first engaging in "as-applied" analysis.  576 U.S. at 636-37 (Alito, J., dissenting).  Moreover, the majority jettisoned the commonly understood standard for facial vagueness – that the statute must be vague "in all its applications" – and, without articulating a substitute, rejected "any suggestion that the existence of some obviously [proscribed conduct] establishes [a statute's] constitutionality."  *Id*. at 602-03 (majority opinion).  The defendant asserts that *Johnson* permits the advancement of a facial challenge without a corresponding as-applied challenge, and without consideration of the statute's

---

[5] The Court is aware of *Harris v. Mexican Specialty Foods, Inc*., 564 F.3d 1301 (11th Cir. 2009), in which the Eleventh Circuit ruled that a facial vagueness challenge was ripe prior to trial because it did not require a developed factual record.  *Id*. at 1308, 1310. Because the *Harris* panel did not acknowledge or distinguish the *Hoffman*/*Di Pietro* rule, the Court is bound by these earlier precedents.

application to the defendant's conduct, at least in cases of statutory "hopeless indeterminacy" as in *Johnson*. *Id*. at 598.

The defendant's position has received a cool reception in the federal appellate courts. *See Bowling v. McDonough*, 38 F.4th 1051, 1061 (Fed. Cir. 2022) ("This principle ["namely, that a person to whom a law is not vague as applied to that person's situation cannot assert facial vagueness"] survives *Johnson* ….") (emphasis omitted); *United States v. Hasson*, 26 F.4th 610, 618 (4th Cir. 2022) ("Hasson claims that the rule prohibiting vagueness challenges by those whose conduct a statute clearly prohibits perished alongside the rule requiring a statute to be vague in all its applications. …. We disagree."); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1190 (10th Cir. 2021) (in *Johnson*, "the Court described the standard for determining whether a statute is, as a matter of law, unconstitutionally vague – not the standard for determining when a party may bring a vagueness challenge."), *rev'd on other grounds*, __ S. Ct. __, 2023 WL 4277208 (2023); *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020) ("*Johnson* did not alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge."); *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019) ("[W]e conclude that *Johnson* … did not alter the general rule that a defendant whose conduct is clearly prohibited cannot be the one to make a facial vagueness challenge to a statute."); *United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017) ("*Johnson* did not change the rule that a defendant whose conduct is clearly prohibited cannot be the one making that [facial vagueness] challenge."), *vacated on other grounds*, 138 S. Ct. 1323 (2018); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (after *Johnson*, "our case law still requires [the defendant] to show that the statute is vague as applied to his particular conduct."); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1250 (2018) (Thomas, J., dissenting) ("This Court's precedents likewise recognize that, outside the First Amendment context, a challenger must prove that the statute is vague as applied to him[, and] *Johnson* did not overrule these precedents.").

Against this mountain of authority, the defendant proffers only *United States v. Morales-Lopez*, 2022 WL 2355920 (D. Utah 2022). The *Morales-Lopez* Court ruled that, "[i]n light of *Johnson*, the court concludes that it may entertain a facial challenge to [Section 922(g)(3)], even without a showing that it is vague as applied to the facts of this case." *Id*. at *7. The Court reasoned that, given *Johnson*'s rejection of an "in all its applications" test for facial vagueness, a statute could be facially vague even if it clearly applies to the defendant's conduct – and if that is so, any criminal defendant should be able to raise a facial challenge. *Id*. at *4. Although superficially appealing, *Morales-Lopez* fails adequately to address the reasons given by the appellate courts for uniformly rejecting its position[6] and fails to consider the universe of doctrines and values underlying the rule restricting facial challenges to those with a valid as-applied challenge, which doctrines and values extend beyond logical necessity.[7] The Court therefore respectfully declines to adopt the *Morales-Lopez* position and instead anticipates that the Eleventh Circuit would follow the lead of its seven sister circuits.[8]

---

[6] *Morales-Lopez* does not address *Bowling*, *303 Creative*, *Kashem*, or *Westbrooks* in any fashion. It addresses *Hasson* and *Bramer* only by noting a "logical quandary" as to when a facial challenge could ever be presented under the pre-*Johnson* regime. 2022 WL 2355920 at *5. Such a quandary, if it exists, may provide a basis for desiring a change in the existing scheme in order to allow facial challenges by parties whose conduct is clearly proscribed, but it does nothing to undermine the reasoning or conclusion of the Fourth and Eighth Circuits that *Johnson* did not accomplish such a change. *Morales-Lopez* disagreed with portions of *Cook* but failed to address the Seventh Circuit's conclusion that one whose conduct plainly falls within a statute is not permitted to bring a facial challenge. *Id*. at *5-6.

[7] *See, e.g., Broderick v. Oklahoma*, 413 U.S. 601, 610-11 (1973); *United States v. Raines*, 362 U.S. 17, 21 (1960); *Hasson*, 26 F.4th at 618-19; *Di Pietro*, 615 F.3d at 1371-72.

[8] The Eleventh Circuit has already done so in an unpublished, and therefore non-binding, opinion. *United States v. Jones*, 2022 WL 1763403 at *2 n.1 (11th Cir. 2022).

Because the defendant's vagueness challenges are premature, his motion to dismiss Counts One and Two for vagueness are due to be denied, without prejudice to his ability to reassert those challenges at an appropriate time.

## II.  Second Amendment.

> A well regulated Militia, being necessary to the security of
> a free State, the right of the people to keep and bear Arms, shall not
> be infringed.

U.S. Const. amend. II.  The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), held that "the Second Amendment conferred an individual right to keep and bear arms," which was violated by a ban on handgun possession in the home for purposes of self-defense.  *Id*. at 595, 635.  The High Court in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "h[e]ld that the Second Amendment right is fully applicable to the States."  *Id*. at 749.

The *Heller* Court acknowledged that "the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, but it articulated no clear test for lower courts to employ in determining whether a particular regulation of the right to keep and bear arms is constitutionally permissible.  Lower courts developed an analysis that focused in part on the importance of the end to be achieved by the regulation and on the strength of the relationship between the end to be advanced and the means employed.  *E.g., GeorgiaCarry.Org, Inc. v. State of Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) (collecting cases).

The Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), rejected this means-end approach for resolving Second Amendment regulation issues as inconsistent with *Heller*.  *Id*. at 2127, 2129.  Instead:

> We reiterate that the standard for applying the Second Amendment
> is as follows:  When the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively protects that
> conduct.  The government must then justify its regulation by
> demonstrating that it is consistent with the Nation's historical

tradition of firearm regulation.

*Id*. at 2129-30; *accord id*. at 2126.  The defendant argues that the plain text of the Second Amendment covers his conduct and that the government cannot show that Sections 922(g)(3) and 922(j) are consistent with the nation's historical tradition of regulating firearms.  (Doc. 18 at 13-18).

### A.  Plain Text.

The "plain text" of the Second Amendment must be applied to the individual's "proposed course of conduct."  *Bruen*, 142 S. Ct. at 2134.  The indictment describes the defendant's conduct in spare terms:  possession of a firearm while an unlawful user of marijuana, and possession of a stolen firearm while knowing and having reason to believe the firearm was stolen.  (Doc. 1).  The defendant describes his conduct as carrying a firearm in his bag while attending a neighborhood barbecue.  (Doc. 18 at 2).  Because the parties do not address why the defendant was carrying a firearm in public, the Court must assume for present purposes that it was for self-defense.  The right to "bear" arms "naturally encompasses public carry," and "the central component" of the Second Amendment right is self-defense.  *Bruen*, 142 S. Ct. at 2134-35 (internal quotes omitted).  Therefore, "[t]he Second Amendment's plain text thus presumptively guarantees [the defendant] a right to 'bear' arms in public for self-defense."  *Id*. at 2135.

The government disputes none of the foregoing.  Instead, the government argues that the plain text of the Second Amendment limits its reach to "law-abiding citizens."  Because it is against the law to use controlled substances without a prescription, and because it is against the law to knowingly possess stolen property, the government argues the defendant is not a law-abiding citizen, that he therefore is not among "the people" to whom the Second Amendment applies, and that his constitutional challenge thus fails, obviating consideration of

the nation's historical tradition of firearms regulation.  (Doc. 21 at 18-23).[9]
Although a number of sister courts have accepted versions of this argument,[10] the
Court is unable to join them.[11]

The government for its position relies on several snippets from *Heller* and
*Bruen*.  The *Heller* Court stated that, "whatever else it leaves to future evaluation,
[the Second Amendment] surely elevates above all other interests the right of *law-
abiding, responsible citizens* to use arms in defense of hearth and home."  554
U.S. at 635 (emphasis added).  The *Bruen* Court described *Heller* and *McDonald*
as "recogniz[ing] that the Second and Fourteenth Amendments protect the right of
an *ordinary, law-abiding citizen* to possess a handgun in the home for self-
defense."  142 S. Ct. at 2122 (emphasis added).  The *Bruen* Court employed the
phrase "law-abiding citizens" over a dozen times in the course of its opinion.  *Id*.
at 2122, 2125, 2131, 2133, 2134, 2135 n.8, 2138 & n.9, 2150, 2156.

The government's presentation is correct, but it is fatally incomplete.  The
*Heller* Court addressed the meaning of "the people" (as contrasted with "militia")
by noting that every other constitutional usage of the term "unambiguously refers
to all members of the political community, not an unspecified subset," from which

---

[9] The "plain text" test extends to whether the individual is among "the people."
*National Rifle Association v. Bondi*, 61 F.4th 1317, 1324 (11th Cir.), *vacated for rehearing
en banc*, 2023 WL 4542153 (11th Cir. 2023).

[10] *E.g., Nicks v. United States*, 2023 WL 4356065 at *11 (W.D.N.C. 2023);
*United States v. Hughes*, 2023 WL 4205226 at *6-7 (D.S.C. 2023); *United States v. Hart*,
2023 WL 4144834 at *2 (W.D. Mo.), *report and recommendation adopted*, 2023 WL
4141044 (W.D. Mo. 2023); *United States v. Costianes*, 2023 WL 3550972 at *4 (D. Md.
2023); *United States v. Padgett*, 2023 WL 3483929 at *5-6 (D. Alaska 2023); *United
States v. Smith*, 2023 WL 2215779 at *2 (E.D. Mich. 2023); *United States v. Coleman*,
2023 WL 122401 (N.D.W. Va. 2023); *United States v. Riley*, 2022 WL 7610264 at *10
(E.D. Va. 2022).

[11] In the following discussion, the Court expands upon the reasoning of two recent
appellate decisions.  *Range v. Attorney General*, 69 F.4th 96, 101-03 (3rd Cir. 2023) (*en
banc*); *United States v. Rahimi*, 61 F.4th 443, 451-53 (5th Cir.), *cert. granted*, 2023 WL
4278450 (2023).

it drew a "strong presumption that the Second Amendment right … belongs to *all Americans*." 544 U.S. at 580-81 (emphasis added). It seems unlikely the Court would then, *sub silentio*, pivot 180 degrees to a conclusion that "the people" in the Second Amendment actually refers to an "unspecified subset" of "law-abiding, responsible" persons.

The Supreme Court's references to "law-abiding" and "responsible" can comfortably be read as expressing, not a categorical exclusion from the Second Amendment of certain groups (irresponsible, non-law-abiding persons) by negative implication, but merely as a categorical identification of certain groups (responsible, law-abiding citizens) presumptively entitled to exercise the Second Amendment rights granted to all "the people." The *Heller* Court recognized that "the right secured by the Second Amendment is not unlimited," noting historical precedents restricting the range of arms (dangerous and unusual), the manner of carrying (concealed weapons), and the place of carrying (schools and government buildings). 554 U.S. at 626-27. As part of this discussion, the Court denied that there is a constitutional right to keep and bear arms "for whatever purpose," *id*. at 626, but it identified self-defense as "the core lawful purpose" for which the right exists. *Id*. at 630. The Court did not rule that self-defense is the *only* permissible purpose for keeping and bearing arms but stated simply that it definitely is *one* permissible purpose.

In its discussion of Second Amendment limitations, the *Heller* Court also addressed the persons who may exercise constitutional rights, insisting that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626. The Court then reframed "felons" and "mentally ill" in more general and positive terms as "law-abiding" and "responsible," respectively. But the Court used these terms as it did "self-defense" – to describe an unquestionable "core" of protection, not to exclude all else from the Second Amendment. That is, *Heller* used "law-

abiding" and "responsible" (as well as "self-defense") to describe only the bulls-eye of the Second Amendment, not its entire target.

This understanding is confirmed by review of the very passage from *Heller* on which the government relies.  The paragraph at issue begins with the observation that "[w]e know of no other enumerated constitutional right whose *core protection* has been subjected to a freestanding 'interest-balancing' approach."  554 U.S. at 634 (emphasis added).  After describing how such an approach could impermissibly erode Second Amendment rights, the Court concluded that, "*whatever else it leaves open to future evaluation*, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id*. at 635 (emphasis added).  Both italicized phrases make clear that the *Heller* Court was describing a central core of constitutional protection, not limning its outer boundaries.

The same conclusion may be drawn from the majority opinion's penultimate paragraph.  The Court "h[e]ld that the District's ban on handgun possession in the home violates the Second Amendment" and declared that, "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights," he must be issued a license.  554 U.S. at 635.  The Court had earlier equated "disqualified" with being "a felon" or "insane."  *Id*. at 631.  By speaking of being *disqualified* from the *exercise* of constitutional rights rather than of being *excluded* from the *possession* of such rights, the Court made clear that felons and the mentally ill (and thus lawbreakers and the irresponsible) fall within "the people."

The *Heller* Court's interpretive process further underscores the point.  The Court began its analysis of the Second Amendment as one always must – with the text itself, giving its words and phrases their "normal and ordinary" meaning.  554 U.S. at 576-77 (internal quotes omitted).  The Court engaged in a lengthy discussion of the terms, "keep," "carry," and "arms," alone and in combination,

focusing on how those words were understood and used in 1791. *Id*. at 581-92. And the Court employed another staple of statutory construction in explicating the meaning of "the people," *viz*., that a term used multiple times in a document is generally assumed to carry the same meaning each time it is used. *Id*. at 579-81.[12]

Other portions of the Second Amendment were suggestive but not conclusive as to their meaning. Because it provides that the right of the people to keep and bear arms "shall not be infringed," it "has always been widely understood that the Second Amendment … codified a *pre-existing* right." *Heller*, 554 U.S. at 592 (emphasis in original). This constitutional language compelled an examination of "the historical background" to puzzle out the parameters of the pre-existing right that could not be infringed. *Id*. The *Heller* Court undertook such an examination before concluding that the pre-existing right codified by the Second Amendment includes an individual right to keep and bear arms for self-defense. *Id*. at 592-95.[13]

The limitations on the Second Amendment right identified in *Heller* all were gleaned by historical review, not by sterile textual analysis. The limitation regarding "dangerous and unusual weapons" drew from "historical tradition." 554 U.S. at 627. The limitation on concealed carry traced to eighteenth-century understandings. *Id*. at 626. The limitation on the carrying of firearms in sensitive places rested on "longstanding prohibitions." *Id*. As did the limitation applicable to felons and the mentally ill, *id*., from which evolved the "law-abiding, responsible" language on which the government seizes.

Nothing in *Bruen* transforms *Heller*'s descriptors into absolute prerequisites to Second Amendment protection. The sentence on which the government relies

---

[12] *E.g., Powerex Corp. v. Reliant Energy Services, Inc*., 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the statute should normally be given the same meaning.").

[13] Reconciling the operative clause of the Second Amendment with its prefatory clause also required resort to historical analysis. 554 U.S. at 595-600.

merely restates, correctly, the constitutional protection affirmed in *Heller*. 142 S. Ct. at 2122. *Bruen* extended that holding from "hearth and home" to "outside the home," *id*., but without purporting to confine the Second Amendment to law-abiding, responsible citizens. It had no need, and perhaps no ability, to issue such a holding, since the individual plaintiffs were undisputedly "ordinary, law-abiding" adult citizens. *Id*. at 2134.

Because nothing in the plain text of the Second Amendment excludes unlawful drug users or knowing possessors of stolen property from keeping and bearing arms for self-defense, the Court turns to historical analysis.[14]

### B. Historical Tradition.

The *Bruen* Court provided some general guidance for evaluating historical sources. If previous generations faced the same "general societal problem" as that addressed by the challenged regulation, their regulatory response to that societal concern is telling. If they did nothing to address the concern, or if they affirmatively rejected efforts to enact regulations similar to the one under review, this would "provide some probative evidence" that the challenged regulation is unconstitutional. If they addressed the concern, but through "materially different means," that also "could be evidence" of unconstitutionality. More generally, "the lack of a distinctly similar historical regulation addressing that [persisting societal concern] is relevant evidence" the challenged regulation is unconstitutional. 142 S. Ct. at 2131.

---

[14] Even were the Second Amendment categorically confined to the law-abiding and responsible, it is as yet unknown whether the defendant is either a law-breaker or irresponsible. The defendant has been indicted for being an unlawful drug user in possession of a firearm and for possessing a firearm he knew or should have known to be stolen, but presently those are mere allegations, and they will remain so until and unless a jury finds him to be such or the defendant admits he is such. The government has not explained how its unproved, unadmitted assertions as to the defendant's status as an irresponsible law-breaker could compel denial of his motion to dismiss even were such status dispositive at the "plain text" step of the *Bruen* analysis.

Because modern regulations addressing "unprecedented societal concerns or dramatic technological changes" may have been "unimaginable at the founding," courts must reason by analogy.  Historical analogues cannot be expected to be "twin[s]" or "dead ringer[s]" for modern-day regulations, but they must be "relevantly similar," that is, similar in relevant respects.  Other points of comparison are possible, but two key metrics are "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."  *Bruen*, 142 S. Ct. at 2132-33 (internal quotes and emphasis omitted).

"[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 142 S. Ct. at 2127.  Thus, analogical reasoning "requires … that the government identify a well-established and representative historical analogue."  *Id*. at 2133 (emphasis omitted).  "[T]he burden rests with the government to establish the relevant tradition of regulation," *id*. at 2149 n.25, and the Court "is not obliged to sift the historical materials for evidence to sustain [the challenged] statute."  *Id*. at 2150.

The defendant argues that the *Bruen* Court established a two-tier system for evaluating regulations, depending on whether the societal concern being addressed existed at the founding.  If it did, says the defendant, the lack of "distinctly similar" regulation from the founding era responsive to that concern automatically renders the modern regulation unconstitutional.  If it did not, merely "relevantly similar" historical regulation will save the modern version.  (Doc. 18 at 16-17; Doc. 22 at 15-16).

It is clear that *Bruen* contemplated both "fairly straightforward" and "more nuanced" historical inquiries.  142 S. Ct. at 2131-32.  But the Court cannot agree that *Bruen* established different evidentiary burdens applicable to each.  Even in

14

the straightforward case, *Bruen* made the absence of distinctly similar historical regulation merely "*relevant* evidence" of unconstitutionality, not *dispositive* evidence.  *Id*. at 2131 (emphasis added).[15]

The *Bruen* Court's analysis confirms this understanding.  According to *Bruen*, the regulations at issue in both *Heller* and *Bruen* addressed the same perceived societal problem, *viz.*, firearm violence in densely populated areas.  142 S. Ct. at 2131.  According to *Bruen*, because "the Founders themselves could have adopted" something like the challenged modern regulation in order to confront this problem, *Heller* "exemplifies this kind of straightforward historical inquiry."  *Id*. Because it involved the same perceived societal concern, *Bruen* necessarily likewise implicated the "fairly straightforward" historical inquiry.  Which means that, were the defendant's argument correct, the *Bruen* Court should have looked for a "distinctly similar" historical regulatory pattern and ended its analysis upon not finding one.  The *Bruen* Court, however, did no such thing.  Indeed, the phrase, "distinctly similar," makes no reappearance in the majority opinion.  Nor does the phrase, "relevantly similar" but, in the course of its exhaustive, nineteen-page "journey through the Anglo-American history of public carry," *id*. at 2156, the Court repeatedly compared the burdens imposed by the challenged regulation with those imposed by the historical analogues offered by the government.[16]  That,

---

[15] As expressed by a sister court, "this language only illustrates the type of evidence courts might consider; it does not suggest the existence of a separate standard of review." *United States v. Connelly*, 2023 WL 2806324 at *6 (W.D. Tex. 2023).

While the Third Circuit in *Range* suggested in passing the existence of a two-tier system, 69 F.4th at 103, it offered no analysis in support of that construction and ultimately applied "relevantly similar" analysis to a straightforward case.  *Id*. at 105.

[16] *E.g.*, 142 S. Ct. at 2145 ("None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime."); *see also infra* n.39.

of course, is a methodology the Court identified with the "more nuanced" analysis for isolating "relevantly similar" analogues.  *Id*. at 2132-33.

The Court therefore concludes that, even when the general societal concern addressed by the challenged regulation also existed in 1791, the question to be answered is whether the regulation is consistent with the nation's historical tradition of firearms regulation.  The lack of "distinctly similar" historical regulation (whatever that means) is relevant to that question, but it is not dispositive and does not obviate the analogical inquiry described in *Bruen*.[17]

### 1.  Section 922(g)(3).

The defendant argues that prohibitions on firearm possession by unlawful drug users is too recent a development to have its own historical tradition and too dissimilar to recognized prohibitions for them to be considered constitutionally analogous to Section 922(g)(3).

---

[17] Even if a heightened, "distinctly similar" standard existed, it is far from clear that it would be implicated in this case.  The defendant correctly notes that "intoxicants existed at the founding," (Doc. 18 at 17-18), but that is perhaps too generalized a comparison.  Except for a brief 20th-century experiment with prohibition, alcohol has not been considered so dangerous as to be banned at the federal level, while in 1970 the passage of the Controlled Substances Act began an uninterrupted half-century period of criminalizing the possession and use of an expanding list of drugs.  The Supreme Court in 2002 acknowledged a "nationwide drug epidemic," *Board of Education v. Earls*, 536 U.S. 822, 834 (2002), paralleling President Nixon's declaration of a "war on drugs."  The Court has been made aware of no founding-era societal concern that alcohol use or abuse was of epidemic proportions and demanded a response equivalent to war, which suggests that the late 20th-century drug environment presents an "unprecedented societal concern."

Moreover, the Second Amendment extends only to weapons that are commonly used for self-defense.  *Bruen*, 142 S. Ct. at 2143.  In 1791, essentially all firearms kept by individuals for that purpose were single-shot weapons that required reloading between shots, effectively limiting discharge to about three rounds a minute.  Their firing rate, range, accuracy and lethality all were far less than that of modern weaponry.  These are "dramatic technological changes" which, when applied to the "nationwide drug epidemic," accentuate the gulf between the societal concerns present at the founding and those addressed by Section 922(g)(3).

### a. Drug users.

The defendant traces Section 922(g)(3)'s prohibition on firearm possession by unlaw drug users only to 1986, which plainly cannot suggest the understanding of the founders two centuries earlier.  The government does not disagree with this assessment but relies on *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), for the proposition that "many states have restricted the right of habitual drug users … to possess or carry firearms."  *Id*. at 684.  The Seventh Circuit listed 26 states with such statutes but, while it is difficult to determine exactly when each such provision was enacted, they appear to be of fairly recent vintage.

Alabama law, for example, provides that "[n]o person who is … a drug addict … shall own a pistol or have one in his or her possession or under his or her control."  Ala. Code § 13A-11-72(b).  According to its credits, Section 13A-11-72 traces its roots to Acts 1936, Executive Session, No. 82.  That act adopted the Uniform Firearms Act.[18]  The Uniform Firearms Act, however, while it regulated the sale of firearms to drug addicts, did not prohibit drug addicts from possessing firearms.[19]  It thus appears that Alabama law did not disarm drug addicts before 1951.[20]

As noted, the Second Amendment "codified a *pre-existing* right," and "[c]onstitutional rights are enshrined with the scope they were understood to have

---

[18] *Tulley v. City of Jacksonville*, 199 So. 3d 779, 790-91 (Ala. Crim. App. 2014), *rev'd on other grounds*, 199 So. 3d 812 (Ala. 2015); *Stinson v. State*, 190 So. 303, 304 (Ala. Ct. App. 1939).

[19] *See* Josh Blackman, *The Supreme Court's New Battlefield*, 90 Tex. L. Rev. 1207, 1215 (2012) (reviewing Adam Winkler, Gunfight:  The Battle over the Right to Bear Arms in America (2011)).

[20] Such a provision appears in the 1975 Alabama Code.  *Williams v. State*, 400 So. 2d 427, 429 (Ala. Crim. App. 1981).  It appears from the credits that the only statutory revision to what is now Section 13A-11-72 that appeared between 1936 and 1975 occurred in 1951.

when the people adopted them ….” *Heller*, 554 U.S. at 592, 634-35 (emphasis in original).  “[W]hen it comes to interpreting the Constitution, not all history is created equal,” and courts “must … guard against giving postenactment history more weight than it can rightly bear.” *Bruen*, 142 S. Ct. at 2136.  Thus, postbellum history “do[es] not provide as much insight” into the 1791 understanding of the Second Amendment’s scope as do contemporaneous sources. *Heller*, 554 U.S. at 614.  Needless to say, 20th-century historical evidence is even less consequential when construing the Second Amendment.  It can be used to “confir[m]” what earlier evidence suggests, but it cannot “provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.” *Bruen*, 142 S. Ct. at 2137, 2154 n.28.  An implicit corollary to this rule is that 20th-century legislation cannot on its own establish the reach of an 18th-century constitutional provision.  The Court therefore agrees with the defendant that the government has failed in its burden to demonstrate that restrictions on firearm possession based on unlawful drug use are sufficiently longstanding to reflect a relevant historical tradition of such regulation.

### b.  Alcohol users.

The government next argues that there is a long and vigorous tradition of disarming alcoholics and excessive drinkers and that these regulations are sufficiently similar to Section 922(g)(3) to carry the government's burden.  (Doc. 21 at 25-27).  The majority of the government’s authorities are old enough to be probative of the founders’ understanding, but they say nothing about the possession of firearms.[21]  The government cites an 1879 Arkansas case in which a

---

[21] Several involve situations in which a judge or witness was disqualified or otherwise sanctioned for participating in a judicial proceeding while drunk.  *Gould v. Crawford*, 2 Pa. 89 (Pa. 1845); *Hartford v. Palmer*, 16 Johns. 143 (N.Y. Sup. Ct. 1819); *Commonwealth v. Alexander*, 3 Va. 156 (1 Va. Cas. 156)  (Va. 1808).  Another merely

constable relieved a "very drunk" person of a pistol, but the opinion identifies no statute authorizing his action.[22]  The government also cites *Yancey* but, as discussed with respect to drug addicts, neither the Seventh Circuit nor the government identifies when the various statutes that now restrict the possession of firearms based on alcohol use first appeared.[23]

The government's only clearly relevant authority is an opinion quoting an 1883 Missouri statute making it an offense to have or carry a firearm "when intoxicated or under the influence of intoxicating drinks."[24]  That single provision, coming a century after ratification of the Second Amendment and addressing only active intoxication, is patently inadequate to carry the government's burden of showing a national tradition of disarming citizens based on their use of alcohol. Had the government tracked down the enactment dates of the various statutes cited in *Yancey*, the situation might be different, but the Court must resolve the defendant's motion based on the record as it is, not what it might have been.[25]

The defendant argues that, even had the government shown an historic tradition of regulating firearms possession based on alcohol, such regulations would not be relevantly similar to Section 922(g)(3), on the grounds that the

---

confirms the "perfect control" a chancery court exercises over the person and property of a "habitual drunkard."  *In re:  Lynch*, 5 Paige Ch. 120, 122 (N.Y. Ch. 1835).

[22] *Wood v. State*, 34 Ark. 341, 342 (Ark. 1879).

[23] Some of the statutes cited in *Yancey*, including those from Delaware, the District of Columbia, Idaho, Minnesota, Nevada, and Rhode Island, appear to address only controlled substances, not alcohol.

[24] *State v. Hall*, 20 Mo. App. 397, 401 (Mo. Ct. App. 1886).

[25] As noted, the Court is "not obliged to sift the historical materials for evidence to sustain [the challenged] statute."  *Bruen*, 142 S. Ct. at 2150.

burdens imposed are not comparable.[26]  The defendant says that, while Section 922(g)(3) prohibits the possession of any firearm at all, even when in one's home and even when not under the influence, state regulations focusing on alcohol prohibit possession only of a particular firearm (on one's person), only when in public, and only when under the influence.  (Doc. 22 at 18).  While these distinctions may apply as to the Missouri statute at issue in *Hall*, they do not clearly apply to the statutes listed in *Yancey*.  All of those reviewed by the Court address persons with longstanding drinking issues regardless of present intoxication,[27] and a number of them prohibit the ownership or possession of any firearm,[28] which necessarily would include those kept in the home.  Because the government failed to place the temporal origins of these regulations sufficiently in the past to reflect a relevant historical tradition, the Court ultimately need not decide the comparability of the burdens placed by such regulations with those imposed by Section 922(g)(3).

The defendant argues that the only general societal concern relevant to this case is firearm violence by persons using intoxicants, and he concludes that the government's failure to demonstrate an historical tradition of disarming such individuals is dispositive of his motion to dismiss.  (Doc. 22 at 16).  As discussed in the next section, however, the Supreme Court views the general societal concern more broadly, reaching at least to addressing firearm violence by persons deemed dangerous or irresponsible due to criminal conduct or mental status.  The government's failure to demonstrate a more precise historical tradition addressing alcohol use is therefore not the final word.

---

[26] The defendant does not dispute that the justifications for the alcohol regulations are comparable to those underlying Section 922(g)(3) for purposes of *Bruen* analysis.

[27] The statutes employ such terms as "habitual drunkard," "chronic alcoholism," and "habitual or chronic alcoholic."

[28] This includes at least the statutes, as cited by the *Yancey* panel, in place in Alabama, Florida, Hawai'i, Missouri, Ohio, and West Virginia.

**c. Felons and the mentally ill.**

As noted, the *Heller* Court recognized that there are "longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it announced that "nothing in our opinion should be taken to cast doubt" on the constitutionality of those prohibitions.  554 U.S. at 626.  The Supreme Court in *Bruen* "made the constitutional standard endorsed in *Heller* more explicit," 142 S. Ct. at 2134, but it "did not disturb those statements [in *Heller* and *McDonald*] or cast doubt on the prohibitions" on firearm possession by felons and the mentally ill.  *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).  On the contrary, the *Bruen* Court stated that its emphasis on historical tradition does not suggest the unconstitutionality of "shall-issue" licensing regimes, in part because their typical requirements of passing a background check and a firearms safety course serve simply "to ensure … that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  142 S. Ct. at 2138 n.9 (internal quotes omitted).  Because, as noted previously, under *Heller* the terms "law-abiding" and "responsible" exclude felons and the mentally ill, respectively, footnote 9 reflects that modern regulations analogous to historical prohibitions on such persons' possession of firearms are constitutional under *Bruen*'s historical-tradition approach.

Neither *Heller* nor *Bruen* "undert[ook] an exhaustive historical analysis … of the full scope of the Second Amendment."  *Bruen*, 142 S. Ct. at 2134; *Heller*, 554 U.S. at 627.  Both, however, recognized that the historical record fully supports modern regulations to the extent they similarly disarm felons and the mentally ill.  While there may be modern felonies that do not fall within this safe harbor,[29]  the defendant does not dispute that the government may constitutionally

---

[29] *Compare Range*, 69 F.4th at 103-06 (performing its own historical analysis regarding the disarming of felons and concluding that the nation's historical tradition

prohibit felons and the mentally ill from possessing firearms. The Court therefore need not resolve whether, and under what circumstances, an independent historical analysis of such regulations is necessary or appropriate.

The defendant's objection to the government's reliance on these historical restrictions is instead that prohibitions on firearm possession by felons and the mentally ill are not relevantly similar to prohibitions on firearms possession by unlawful drug users. The defendant argues that neither metric identified in *Bruen* – a comparable burden on the right to armed self-defense and a comparable justification for that burden – is satisfied here. (Doc. 18 at 16-17). The Court cannot agree.

The defendant does not explain his challenge to the comparability of the burden imposed, leaving the Court nothing to consider. The *Heller* Court described the historical restriction on felons and the mentally ill as being a "prohibition[n] on the possession of firearms," which is identical to what Section 922(g)(3) accomplishes. Even if some of the unidentified historical exemplars the *Heller* Court had in mind did not include a lifetime ban but incorporated the possibility of restored Second Amendment rights (as by a showing of rehabilitation or cure),[30] Section 922(g)(3) similarly places the keys to the gun cabinet in the hands of the individual, who can regain his rights by ceasing his unlawful drug use.

---

does not support imposing, under Section 922(g)(1), a lifetime ban on firearms possession by one convicted of making a false statement to obtain food stamps) *with Jackson*, 69 F.4th at 502-05 (performing its own historical analysis regarding the disarming of felons and concluding that the nation's historical tradition does support the disarming, under Section 922(g)(1), of a felon convicted of sale of a controlled substance).

[30] *See Range*, 69 F.4th at 105 ("As one of our dissenting colleagues notes, a felon could 'repurchase arms' after successfully completing his sentence and reintegrating into society.").

As for comparable justification, the defendant acknowledges that restrictions applicable to felons and the mentally ill "comport with a historical principle of disarming select groups for the sake of public safety."[31]  He denies, however, the existence of any "public safety" justification for disarming unlawful drug users.  That would certainly come as a surprise to the 90th Congress, which passed the Omnibus Crime Control and Safe Streets Act of 1968 ("Omnibus Act") and the Gun Control Act of 1968 after hearing the House manager declare that "'[n]o one can dispute the need to prevent drug addicts … from owning, or possessing firearms,'" in the name of "'reducing [sic] the danger of crime" and combating "firearms misuse.'"  *Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting legislative history).  "The very structure of the Gun Control Act demonstrates that Congress … sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."  *Barrett v. United States*, 423 U.S. 212, 218 (1976).  And "[e]ach Title [of the Omnibus Act] prohibits categories of presumptively dangerous persons from transporting or receiving firearms."  *Lewis v. United States*, 445 U.S. 55, 64 (1980).[32]

The defendant, quoting from *Bruen*, insists that "the government may not simply posit that the regulation promotes an important interest."  142 S. Ct. at 2126.  The *Bruen* Court was not thereby, as the defendant apparently believes, commenting on how the "comparably justified" prong of its historical analysis is

---

[31] The defendant's concession jibes with *Heller*'s reworking of "felons and the mentally ill" into the broader categories of "law-abiding" and "responsible."  It accords also with *Bruen*'s recognition that the "longstanding prohibitions" blessed by *Heller* can be extended by analogy to new situations.  142 S. Ct. at 2133.  And it parallels the Eleventh Circuit's post-*Bruen* conclusion that this metric is satisfied if both the old and new regulations aim at "enhancing public safety."  *Bondi*, 61 F.4[th] at 1326-27, 1331.

[32] As the defendant notes, (Doc. 22 at 17), the 1968 acts prohibited only the transfer of firearms to unlawful drug users and drug addicts; the prohibition on possession was added in 1986.  It cannot seriously be argued that Congress in 1986 tightened the restrictions on such persons while simultaneously abandoning any purpose of reducing crime and irresponsible behavior.

to be applied; instead, it was rejecting the appellate courts' post-*Heller* means-ends analysis.  Nothing in *Heller* or *Bruen* purports to require the government to prove from sources beyond the body of the regulation itself the impetus for the regulation.  That would be a tall – perhaps insurmountably tall – order with respect to those legislatures, county commissions, city councils, and other legislative bodies creating little recorded legislative history, and not much easier when, as is often the case, legislative history exists but does not address the specific question later generations ask of it.

In any event, the legislative history referenced above leaves no room to doubt that Congress enacted Section 922(g)(3) in an effort to reduce crime and irresponsible behavior.  To the uncertain extent the defendant intends to suggest that courts are not bound by legislative statements of purpose when the means selected are patently ill-suited to accomplish the stated end, it is sufficient to say that this case lies nowhere near those borderlands.  If a legislature ever disarms left-handed persons in the name of public safety on the theory they are sinister,[33] the defendant may have something.  Drug addicts and unlawful users of controlled substances, however, may reasonably be viewed as more likely than the general population to engage in crime (including robbery and other crimes of violence to feed their habit, as well as trafficking) and as less likely than the general population (due at least to altered mental states both while under the influence and while in withdrawal) to handle a firearm responsibly.[34]

---

[33] The English word "sinister" derives from a Latin word for "left-handed."

[34] Appellate courts construing Section 922(g)(3) post-*Heller* have so concluded. The Fourth Circuit found that empirical studies "indicate a strong link between drug use [including marijuana use] and violence."  *United States v. Carter*, 750 F.3d 462, 467 (4th Cir. 2014); *accord Yancey*, 621 F.3d at 686.  "[C]ommon sense provides further support" for this proposition, suggesting that drug users are more likely to engage in hostile encounters with law enforcement, with victims of their crimes against persons and property, and with the general public.  *Carter*, 750 F.3d at 469-70; *see also United States*

No doubt there are drug addicts and unlawful users of controlled substances whose possession of a firearm poses no greater risk to public safety than is true of the general population.  But "there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons," because "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 69 F.4th at 504.  Perhaps there can come a point when the category, while fitting for some, sweeps too broadly, but the defendant has raised no overbreadth challenge.

In a single sentence, the defendant does assert a personal as-applied challenge to Section 922(g)(3).  Without explanation, he posits that the statute should not apply to him because he has no prior drug offense convictions and was not under the influence of any drug when he was arrested.  (Doc. 18 at 17).  Restrictions on a person's enjoyment of Second Amendment rights do not depend on the existence of a criminal history, as the Supreme Court's approval of restrictions on the mentally ill makes clear.  Nor do they depend on a moment-by-moment assessment of each individual's risk to society, as the Supreme Court's approval of restrictions on felons makes equally clear.

---

*v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) ("Habitual drug users … more likely will have difficulty exercising self-control ….); *Yancey*, 621 F.3d at 685 (same).

A number of sister courts have upheld the constitutionality of Section 922(g)(3) post-*Bruen*.[35]  Although its analysis differs somewhat from that underlying these precedents, the Court reaches the same conclusion.[36]

The Court recognizes that two sister courts have sustained as-applied challenges to Section 922(g)(3).  *United States v. Connelly*, 2023 WL 2806324 (W.D. Tex. 2023); *United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023).  Both opinions are thoughtful and thorough, but the Court is respectfully unable to subscribe to their analysis.

The *Harrison* Court concluded that the only "longstanding prohibitions" in the nation's history regarding felons were directed at "dangerous felons," who had demonstrated their dangerousness by the very crimes of which they had been convicted.  2023 WL 1771138 at *16.  The Court extrapolated that only restrictions based on a "demonstrated … proclivity for violence through past violent, forceful, or threatening conduct [hereinafter, 'violent conduct']" can be constitutionally analogized to this historical precedent.  *Id*.; *accord id*. at *17.

---

[35] *United States v. Daniels*, 610 F. Supp. 3d 892 (S.D. Miss. 2022); *United States v. Beverly*, 2023 WL 4466507 (N.D. W. Va. 2023); *United States v. Ray*, 2023 WL 4378152 (S.D.W. Va. 2023); *United States v. Gil*, 2023 WL 4356067 (W.D. Tex. 2023) (Briones, J.); *United States v. Walker*, 2023 WL 3932224 (D. Neb. 2023); *United States v. Costianes*, 2023 WL 3550972 (D. Md. 2023); *United States v. Le*, 2023 WL 3016297 (S.D. Iowa 2023) (Locher, J.); *United States v. Stennerson*, 2023 WL 2214351 (D. Mont. 2023); *United States v. Randall*, 2023 WL 3171609 (S.D. Iowa 2023 (Rose, J.); *United States v. Posey*, 2023 WL 1869095 (N.D. Ind. 2023); *United States v. Lewis*, 2023 WL 187582 (W.D. Okla. 2023); *United States v. Black*, 2023 WL 122920 (W.D. La. 2023); *United States v. Gilpin*, 2023 WL 387049 (W.D. Mo. 2023); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. 2022) (Albright, J.); *Fried v. Garland*, 2022 WL 16731233 (N.D. Fla.  2022); *United States v. Harper*, 2022 WL 8288406 (N.D. Iowa), *report and recommendation adopted*, 2022 WL 4595060 (N.D. Iowa 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. 2022).

[36] The government argues that Second Amendment rights may be properly restricted if a group is deemed not "law-abiding," not "trustworthy," or not "virtuous." (Doc. 21 at 23-25).  Because Section 922(g)(3) may be upheld for reasons explained in text, the Court need not, and does not, reach these arguments.

"[T]he mere fact that [a defendant] uses marijuana," the Court continued, "does not tell us" that he has such a demonstrated proclivity. *Id*.

Turning to the mentally ill, the *Harrison* Court read the government's historical sources as "limit[ing] disarmament to *dangerous* lunatics." 2023 WL 1771138 at *18 (emphasis in original). The use of marijuana, it repeated, "does not indicate that someone is in fact dangerous," much less "analogous to a 'dangerous lunatic.'" *Id*. Even if drug users mimic the mentally ill in having reduced self-control, "that argument appears to have no limit," since the same can be said of persons with autism or ADHD, whom no one suggests can be constitutionally disarmed on that basis. *Id*. at *19.

The Court does not quarrel with *Harrison*'s assessment that the mere legislative labeling of conduct (such as mowing one's yard) as a "felony" cannot automatically expose violators to the loss of their Second Amendment rights. 2023 WL 1771138 at *11. The Court also accepts for argument *Harrison*'s restriction of disarmament to those convicted of "dangerous" felonies. What the Court finds suspect is the assumption that, because the dangerousness of a felon under this standard is necessarily demonstrated by his individual, actual violent conduct, it follows that past violent conduct by a specific individual charged under Section 922(g)(3) is the only way that dangerousness sufficient to warrant disarmament of that individual may be constitutionally demonstrated.

In the first place, and as noted previously, the Second Amendment permits restrictions based on membership in a category, without a showing that each individual member of the category presents a danger of firearms violence. *Jackson*, 69 F.4th at 504. Thus, historically recognized firearms restrictions applicable to Catholics, Native Americans, and loyalists did not depend on individualized showings that the specific person to be disarmed was violent or dangerous. *Id*.

Moreover, the *Harrison* Court's "past violent, forceful, or threatening conduct" requirement for restricting Second Amendment rights is not compelled

by history or precedent.  Again, Catholics, Native Americans, and loyalists were historically disarmed regardless of whether they had personally engaged in any violent activity or threatening conduct.[37]  *Harrison* cited then-Judge Barrett in support of its quoted standard, but she did not use that phrase; instead, she stated that "[t]he historical evidence … support[s] [the] proposition … that the legislature may disarm those who have demonstrated a proclivity for violence *or* whose possession of guns would otherwise threaten the public safety."  *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) (emphasis added).  Thus, Judge Barrett did not restrict how a proclivity for violence could be demonstrated; indeed, she did not require such a demonstration at all, so long as a threat to public safety was otherwise shown.

As noted, the second key metric identified in *Bruen* for assessing whether a modern regulation is constitutionally analogous to an historical restriction is whether the burdens of each on the exercise of Second Amendment rights are "comparably justified."  142 S. Ct. at 2133.  The defendant says the relevant historic justification when considering the disarmament of felons is "public safety," while many courts use the parallel term, "dangerousness."  The *Harrison* Court seems to say that the proper measure of historic justification for purposes of *Bruen* is not merely dangerousness, but dangerousness as manifested in a very specific, very individualized way.  In the Court's view, *Harrison* demands excessive precision of an historical analogue.  *Bruen* requires that the justifications be "comparable," not that they be identical – and especially not that they be identical in how the justifications are shown to exist.[38]

---

[37] Membership in these groups may have been considered threatening, but it did not amount to threatening "conduct," as the *Harrison* test requires.

[38] The *Harrison* Court's rejection of historical regulations of the mentally ill as appropriate analogues may be critiqued along similar lines.  That the label of "dangerous lunatic" may have been the result of individualized determinations (a proposition not clearly stated or demonstrated in *Harrison*) does not mean that the Constitution forbids

The *Connelly* Court developed two themes present as undercurrents in *Harrison*. First, unlike firearms restrictions based on one's status as a felon, which necessarily cannot arise until after a conviction, Section 922(g)(3) deprives unlawful drug users of their Second Amendment rights without any pre-deprivation process. Second, marijuana is used by millions of Americans, and it seems implausible that they could all be deemed sufficiently dangerous to justify the mass stripping of their Second Amendment rights. 2023 WL 2806324 at *10-12; *see also Harrison*, 2023 WL 1771138 at *9-10, *17-18.

*Connelly* found support for its first concern in *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*, 2023 WL 4278450 (2023). In striking down Section 922(g)(8), the Fifth Circuit noted several times that this provision requires an order entered after only a civil proceeding, not after a full criminal proceeding, which unfavorably distinguished Section 922(g)(8) from some of the government's proposed analogues. 61 F.4th at 455 & n.7, 458-59, 460. The *Rahimi* panel believed the nature of the proceeding was relevant to the first *Bruen* metric, but the Court is doubtful.

While the Supreme Court initially framed the first metric in shorthand fashion as "how" the regulations burden First Amendment rights, it immediately clarified that what this metric requires is an assessment of "whether modern and historical regulations impose a comparable burden on the right of armed self-defense." 142 S. Ct. at 2132-33. The *Rahimi* Court, seizing on the shorthand description, understood that Section 922(g)(8)'s provision of "only a civil proceeding," 61 F.4th at 460, "go[es] to *how* the statute accomplishes its goal." *Id*. at 455 (emphasis in original).

In applying its first metric, however, the *Bruen* Court did not state or suggest that the relevant comparison extends to the procedure employed when, or

---

firearms restrictions based on categories, given the historical pattern of group disqualification.

before, the right is restricted; rather, it applied the metric to compare the extent of the restriction imposed.[39]  So also *Heller*.  554 U.S. at 632 (certain regulations identified by the dissent "do not remotely burden the right of self-defense as much as an absolute ban on handguns").

The *Bruen* Court's treatment of surety statutes highlights the point.  The government identified, as historical analogues to New York's may-issue licensing law, several 19th-century statutes requiring certain individuals to post bond before carrying weapons.  These laws required a concerned person to seek and obtain such an order from a judicial officer on a proper showing that the individual at issue posed some threshold risk of breaching the peace.  142 S. Ct. at 2148.  New York law required anyone wishing to possess a firearm outside the home for self-defense to convince a licensing officer – who might or might not be a judicial officer – of his good character and unblemished criminal and mental health record,

---

[39] *See* 142 S. Ct. at 2142 ("[W]e cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection."); *id*. at 2145 ("Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry."); *id*. at 2146 ("Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so"); *id*. at 2147 ("All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues."); *id*. at 2150 ("None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.").

as well as a special need for self-defense, with little opportunity for judicial review.  *Id*. at 2122-23.  In rejecting the surety statutes as analogues, the Supreme Court did not mention differences in procedure (especially, the lack of a guaranteed judicial officer or court hearing under New York law); instead, the Court focused on differences in the scope of the restrictions.  Under New York law, the restriction was a complete ban, which extended to most citizens due to the high substantive bar (special need); under the surety statutes, the restriction was the inconvenience of posting bond, which requirement extended only to a small percentage of the population (those reasonably likely to breach the peace).  *Id*. at 2148.

The *Bruen* Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment."  142 S. Ct. at 2132.  It is therefore possible that a comparison of procedures could be folded into an as-yet unannounced third metric, the content, parameters, and nuances of which all remain obscure.  There are certainly historical examples of individualized, judicial determinations of a person's membership in a restricted class (felons) and perhaps of a person's dangerousness (the mentally ill), but there are also examples of category-based restrictions enforced without individualized, judicial determinations (Catholics, Native Americans).  Happily, the Court need not dive into these deep waters, as the defendant has advanced no argument that Section 922(g)(3) violates the Second Amendment because it does not require, before an individual's right to possess firearms for self-defense is restricted, formal proceedings to establish the individual's status as a drug user and/or his dangerousness as a possessor of firearms.

For its second expressed concern, the *Connelly* Court relied on the legality of the recreational use of marijuana in almost half the states and on a 2022 Gallup poll regarding marijuana use.  2023 WL 2806324 at *12 & n.17.  *Connelly* characterized the poll as reflecting that millions of Americans "regularly use" marijuana, *id*. at *12, but the report actually says only that 16% of adult

Americans "report smoking marijuana," with no reference to frequency.  It may nevertheless be assumed for argument that millions of adult Americans now use marijuana with sufficient regularity to qualify as "drug users" under Section 922(g)(3).[40]  The legal import of that development, however, is unclear.[41]

Assuming, as the Court concludes, that Section 922(g)(3)'s prohibition on gun possession by unlawful drug users did not violate the Second Amendment when it was enacted in 1986, could it become unconstitutional in 2023?  Presumably so, if the characteristics that rendered the prohibition constitutional are shown to have vanished.  In this case, that would mean the connection between unlawful marijuana use and violent crime/dangerousness/public safety has been severed or weakened to the point it can no longer justify Section 922(g)(3)'s intrusion on the right to keep and bear arms.  Fresh empirical studies, for example, contradicting those on which the *Yancey* and *Carter* Courts relied, might do the trick, but *Connelly* cited none.

Instead, *Connelly* suggested that the legalization of recreational marijuana use, and the recent surge in such use, renders a dangerousness rationale untenable.  Without a showing (which *Connelly* did not undertake) that violent crime did not spike along with increased marijuana use, that argument is not persuasive or even

---

[40] The Courts of Appeal are in agreement that Section 922(g)(3) requires "regular" unlawful drug use to qualify as a "drug user."  *United States v. Burchard*, 580 F.3d 341, 347-48 (6th Cir. 2009) (citing cases from the Third, Fourth, Fifth, Eighth, and Ninth Circuits).

[41] The trend of increased marijuana use appears to be a recent one, postdating the 1968 enactment and 1986 amendment of Section 922(g)(3).  It was not until 1996 that California became the first state to legalize medical marijuana.  It was not until 2012 that Colorado and Washington became the first states to legalize recreational marijuana.  Even a year after that, according to the same article on which *Connelly* relied, only 7% of adult Americans reported using marijuana.

supportable.  The Court does not suggest that a proper showing could not be made, only that it has not been made to date.[42]

*Harrison* and *Connelly* raised issues specifically addressing marijuana, only one of the many controlled substances subject to Section 922(g)(3).  Because the defendant in this case raises no marijuana-is-different argument, the Court need not definitively resolve those issues.  For the reasons set forth above, the Court concludes that Section 922(g)(3) does not violate the Second Amendment, either facially or as applied to the defendant in the limited ways he contests.

### 2. Section 922(j).

"It shall be unlawful for any person to … possess … any stolen firearm … knowing or having reasonable cause to believe that the firearm … was stolen."  18 U.S.C. § 922(j).  Remarkably, the defendant insists he has a Second Amendment right to possess a firearm that he knows or should know is stolen, which right Section 922(j) unconstitutionally abridges.  Unremarkably, he offers no authority in support of that remarkable proposition.

It is difficult to overstate the implausibility of the defendant's argument.  It would mean, for example, that a thief could steal a firearm from the person of its owner, who would summon the police only to be informed that, while the owner was free to steal back his weapon, the police could do nothing because that would amount to a governmental restriction on the thief's constitutional right to possess the owner's gun.[43]

---

[42] What cannot support a determination of post-enactment unconstitutionality (and *Connelly* did not suggest otherwise) is a mere alteration in society's views about the acceptability of marijuana use.  Continuing to criminalize the possession of firearms by millions of Americans based on their use of a drug that society largely views as harmless may be bad or unpopular policy, but it would not, for that reason alone, be unconstitutional.

[43] Section 922(j) applies to prosecutions against the thief.  *United States v. Richardson*, 787 Fed. Appx. 1015, 1019-20 (11th Cir. 2019).

It is similarly difficult to imagine that the founders lived in, or contemplated, such a through-the-looking-glass world.  In an era of vast distances between settlements, without a standing army or police force, and with potentially hostile Native Americans on the frontier and lawless men everywhere, did the founders really accept being rendered defenseless and without legal recourse?  Did they really believe that horse thieves should be whipped, branded, and have their ears cut off,[44] but that gun thieves and their knowing successors in possession should be rewarded for their crimes?

As addressed in Part II.A, the Court accepts that even gun thieves are part of "the people" to whom the Second Amendment extends.  It is also clear that Section 922(j) burdens the right of such persons and their knowing successors in possession to keep and bear arms, since it penalizes the possession of a particular

---

[44] In March 1780, the Pennsylvania Legislature passed "An Act to increase the punishment of horse stealing."  It reads in pertinent part as follows:

> WHEREAS the punishments heretofore provided against the crime of horse stealing have not proved sufficient to deter evil minded persons from the commission thereof:  For remedy whereof,

> Be it enacted, and it is hereby enacted, That if any person or persons, from and after the passing of this act, shall feloniously take and carry away any horse, mare or gelding, of the property of any other person or persons, or of the United States of America, and shall be thereof convicted, every such person or persons so offending, for the first offence, shall stand in the pillory for one hour, and shall be publicly whipped on his, her or their bare backs with thirty-nine lashes, well laid on, and at the same time shall have his, her or their ears cut off, and nailed to the pillory; and for the second offence shall be whipped and pillored [sic] in like manner, and be branded on the forehead, in a plain and visible manner, with the letters H. T.

Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the First Day of October, One Thousand Seven Hundred and Eighty-One at 847, Republished under the Authority of the Legislature, Alexander James Dallas comp. (1797) ("Laws"), available at https://en.wikipedia.org/wiki/Horse_theft n.13 (last visited July 17, 2023).  *See generally* Joel Fishman, The History of Statutory Compilations in Pennsylvania, 86 Law Library Journal 559, 560-61 (1994) (describing the development of Laws).

type of firearm (one the possessor knows or should know is stolen).[45]  The question becomes, under *Bruen*, whether criminalizing the possession of a stolen firearm under such circumstances fits within the nation's historic tradition of firearms regulation.  Despite the implausibility of the defendant's position, *Bruen* places the burden on the government to prove the affirmative, and to do so by resort to relevantly similar historical analogues.

The government responds by directing the Court's attention to *United States v. Gore*, 2023 WL 2141032 (S.D. Ohio 2023), the only case known to have addressed the constitutionality of Section 922(j) post-*Bruen*.  The *Gore* Court listed a number of state laws enacted between 1730 and 1833 "that prohibited the purchase or receipt of stolen goods, chattel, and other effects," *id*. at *4 & n.1, and the government adds a slew of antebellum statutes to the same effect.  (Doc. 21 at 28-29).  The defendant objects that none of the cited statutes "specifically regulate firearms, as opposed to property generally," (Doc. 22 at 19), but that is of no consequence given that "there is no indication that firearms were exempt from such laws."  *Gore*, 2023 WL 2141032 at *4.[46]

---

[45] The defendant identifies the burden imposed by Section 922(j), not as its prohibition on the possession of particular firearms, but as a "de facto requirement to investigate the history of any firearm," an inconvenience effectively placed on gun possessors in order to avoid running afoul of the provision's "reasonable cause to believe" standard of culpability.  (Doc. 18 at 2).  Because it is unnecessary to the proper disposition of his motion to dismiss, the Court does not resolve whether the defendant's understanding of what constitutes a relevant burden on Second Amendment rights is accurate.

[46] The Court respectfully disagrees with *Gore*'s alternate rationale that, while the Second Amendment extends only to the possession of arms for "lawful purposes," there is "no lawful purpose for which a private citizen would knowingly possess a stolen firearm."  2023 WL 2141032 at *4.  The former proposition finds support in *Heller*, 554 U.S. at 620, but one such lawful purpose is self-defense, *id*. at 630, and even one knowingly possessing a stolen firearm may be doing so for self-defense.  As noted in Part I, the defendant's purpose in possessing the firearm at issue is unresolved and therefore must, for present purposes, be assumed to be that of self-defense.

The defendant next objects that the statutes on which the government rests all required that the accused have actual knowledge that the property possessed was stolen, rendering them inappropriate analogues for Section 922(j), which allows conviction based on the lesser *mens rea* of "reasonable cause to believe." (Doc. 22 at 19).  The quoted phrase, for purposes of Section 922, means "to have knowledge of facts which, although not amounting to direct knowledge, would cause a reasonable person, knowing the same things, reasonably to conclude that the [firearm] was [stolen]."  *United States v. Peters*, 409 F.3d 1263, 1269 (11th Cir. 2005) (internal quotes omitted).[47]  This is a lesser *mens rea* than actual knowledge, but it is plainly a culpable mental state sufficient to support criminal sanction. What the defendant is demanding is a "historical *twin*," something that *Bruen* does not require.  142 S. Ct. at 2133 (emphasis in original).  What *Bruen* does require, and what the government has provided, is "a well-established and representative historical analogue."  *Id*.

The defendant frets that "a law-abiding person could easily find themselves in violation of 922(j)."  He imagines a scenario in which a person innocently receives a firearm and only later discovers it is stolen; because Section 922(j) makes it a crime to "dispose" of a firearm known to be stolen, the person is caught between Scylla and Charybdis – violating Section 922(j) if he continues to possess the firearm and violating it still if he ends his possession by disposing of it.  (Doc. 22 at 14).  The defendant presents an interesting conundrum, but it appears to say nothing about whether Section 922(j) unconstitutionally infringes on the Second Amendment rights of persons that know or should know the firearm they possess is stolen.  Even if it were relevant to that question, it could not possibly render the provision facially invalid, and the defendant does not assert that the hypothetical scenario describes his situation.

---

[47] *Peters* involved a prosecution under Section 922(d)(1), but the defendant offers no reason the same standard would not apply to Section 922(j).

The defendant's only as-applied challenge to Section 922(j) is that it should not apply to him because his "only knowledge surrounding the stolen firearm was that he received it for free." (Doc. 18 at 17). As discussed in Part I, the scope of the defendant's knowledge of the gun's history is a factual question unfit for pretrial resolution. It may nevertheless be said with confidence that the defendant's knowledge cannot possibly be so limited. If the defendant knows he received the firearm for free, then he also knows the circumstances under which he received it (for example, who gave it to him, where, when, how it was explained as a free gift, and so forth), each of which circumstances colors the reasonableness of a belief he had received a non-stolen gift, and many of which may implicate other items within his knowledge that further affect whether he had reasonable cause to believe the firearm was stolen.

In short, the defendant's as-applied challenge proceeds from a false premise: that he could be convicted based on nothing more than having received the weapon for free. Because this premise fails, his challenge fails with it.[48]

## CONCLUSION

For the reasons set forth above, the defendant's motion to dismiss is **denied on the merits** with respect to the Second Amendment and is **denied as premature** with respect to vagueness.

DONE and ORDERED this 17th day of July, 2023.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[48] The Court therefore need not decide whether the government's catalogue of statutes would still be sufficiently similar to Section 922(j) for it to pass constitutional muster if that provision allowed conviction on such thin evidence of a culpable mental state.